C. & L. RURAL ELECTRIC COOPERATIVE CORPORATION v. McEntire.

4-8970                                          225 S. W. 2d 941

Opinion delivered December 19, 1949.

Rehearing denied February 6, 1950.

S. *Hubert Mayes* and *Rose, Dobyns, Meek & House,* for appellant.

*Brockman & Brockman* and *Bridges, Bridges, Young & Gregory,* for appellee.

GRIFFIN SMITH, Chief Justice. McEntire, a construction company employe, was seriously burned and permanently impaired when he came in contact with an electrically-charged wire. Three defendants have appealed from his judgment for $40,000.

. . .

C & L Rural Electric Coöperative Corporation operates in Lincoln and other counties as owner of transmission lines and appurtenances. It had an extensive reach in 1947 when new demands prompted expansion. Existing installations had been built by three contractors, one being Delta Construction Company of Clarksdale, Miss. The Federal Government advanced $363,000 through Rural Electrification Administration, acting by an Administrator whose official status with C & L was evidenced by written contract embracing enumerated standards of efficiency. The Administrator required C & L, in its plan for expenditure of the money, to retain certain authority. A supervisor could be named by the Government agency, and the contractor was bound to comply with all reasonable directions that might be given, either by C & L, or the supervisor.

Dickinson & White, electrical engineers, were employed by C & L to draft expansion plans with specifications; also to let the contract on behalf of C & L, and to supervise construction. Dickinson & White employed E. A. Knoch and Warren A. Ramsey to oversee the work, Delta having procured the contract.

On the nineteenth of June, 1947, McEntire, who was then 26 years of age, met with the misfortune resulting

in the litigation. A primary wire on the pole he had climbed carried 7620 volts of undisclosed amperage. His inadvertent contact with it caused burns that later destroyed tissues, nerves, and the circulatory structure of each hand, necessitating amputation four or five inches below the elbows when infection developed. Continuing pain prompted a second operation on the left arm. Comparatively slight injuries to other parts of the body attended the accident, with partial blindness for several hours.

. . .

Paul Strode was a Delta superintendent who worked in close coöperation with Knoch and Ramsey. Delta's temporary offices in Star City were within two or three blocks of quarters occupied by C & L.

On the morning of the nineteenth McEntire's assistant was Clinton K. Baggett. Each would make wire connections when directed to do so. The duty immediately at hand took them twelve miles south on the Star City-Monticello highway where they left the main thoroughfare and went by a known route to Pole No. 249. The place had been designated by Work Order No. 314, prepared by Ramsey and given to Strode. Four poles were mentioned in the order, but we are concerned only with what was done when No. 249 was reached. Pertinent parts of the memorandum are shown in the footnote.[1]

When the clean-up note was issued, Ramsey, Strode, Delta, Dickinson & White, and C & L, knew that the pole was "hot," or they were in possession of facts or had access to data from which the information could have been had.

It will be observed that in sequence of transactions Rural Electrification (the Government) dealt with C & L; C & L employed Dickinson & White; Dickinson & White, on behalf of C & L, negotiated the contract with Delta, but also employed Ramsey; Ramsey prepared the inspection or work orders and gave them to Strode, who

---

[1] ". . . Pole No. 249. Lower El-2 for proper cond-clearance. Complete A-6 assembly on north and south line. Install El-1 on north side of pole."

was Delta's man, and Strode gave them to appellee. The questions are: Were Dickinson & White independent contractors employed by C & L? If the contract on its face tended to create that relationship, was it the purpose to restrict activities of Dickinson & White to the paper preliminaries, such as plans and specifications, procurement of the contract, and supervision of the contractor's work as to results alone, and without participation in or interference with the means and methods by which results were accomplished? (a) Was the contract Dickinson & White made for C & L with Delta, embracing as it did express implementation through services of these Engineers, trilateral as to scope—thus insuring overlappings throughout, or (b) did C & L and Dickinson & White as employer and agent, and Delta as the producer of a finished construction, each leave to the other complete freedom of action regarding means and methods? Conversely, if the contracts as such were legally sufficient to make Dickinson & White independent Engineers and Delta an independent contractor, did inter-party actions destroy this design to such an extent that the appellants are bound by the misconduct causing appellee's misfortune?[2]

*Contract Between C & L, and Dickinson & White.*—The Engineers agreed to render necessary services ".  .  .  in respect of rephasing, conversion, rebuilding, or rehabilitation of existing lines, [and] the enumeration of specific duties and obligations  .  .  .  shall not be construed to limit the general undertakings of the Engineer."

Supervision of construction required the Engineer to inspect all materials and to reject any found inferior to specifications. The Engineer was also to supervise "the manner of the incorporation of the materials in the project and the workmanship with which such materials shall be incorporated.  .  .  .  The Engineer shall notify C & L and the Administrator when the project, or any

---

[2] A nonsuit was taken as to Knoch. Delta, protected under Workmen's Compensation Law, was not a defendant. American Casualty Company, Delta's insurer, intervened to claim rights of reimbursement.

part thereof, shall be ready to be energized. Whenever C & L and the Administrator shall notify the Engineer that the project, or such section thereof, may be energized, the Engineer shall, when directed to do so by C & L, cause the project, or such section thereof, to be energized.''

*Contract Between C & L, and Delta.*—All materials, tools, machinery, equipment, labor, transportation, ''and other means necessary [to fulfillment of the contract]'' were to be supplied by Delta. All reasonable precautions for the safety of employes engaged in the work were to be taken, with care for safety of the public. From commencement until completion, or until C & L should take possession if at an earlier date, control was with the Contractor, who was responsible for ''all risks in connection with the construction of the project and the materials to be used therein.'' The Contractor was obligated to constantly supervise all work. To this end a competent Superintendent ''would be present at all times during working hours where the construction is being carried on, [and] directions and instructions given to [such] Superintendent by the Engineer shall be binding on the Contractor. [C & L] reserves the right to require the removal from the project of any employee of the Contractor if in the judgment of the Engineer such removal shall be in order to protect the interest of [C & L]. The Engineer or the Supervisor, if any, shall have the right to require the Contractor to increase the number of his employes and to increase or change the amount or kind of tools and equipment if at any time the progress of the work shall be unsatisfactory to the Engineer or Supervisor.''

*Purpose of the Contracts.*—The undertakings contemplated by C & L in 1947 could best be carried out with Government coöperation and borrowed money. But rules of Rural Electrification were such that it could not, or would not, advance funds without retaining the interim control it thought would be necessary to assure satisfactory completion of the project, hence the requirement regarding Engineers. This is made certain by language in the contract between C & L and Delta that ''Prior to

the completion of the project C & L, upon written notice to the Contractor, *approved in writing by the Administrator,* may test the construction . . . by temporarily energizing any section or sections thereof. During the period of such test the section or sections of the project so energized shall be considered as within the possession and control of C & L," etc. In a paragraph of definitions "Engineer" is one employed by C & L, "with the approval of the Administrator, to supervise the construction of the project." "Completion" means full performance by the Contractor, evidenced by a certificate . . . signed by the Engineer "and approved in writing by the Administrator." Other language discloses an intent that Rural Electrification should exercise a measure of control throughout the construction period, and this control was something more than a right to demand that the work, when done, should meet all specifications.

*Acts and Circumstances Affecting Appellee.*—Transactions directly connected with appellee's attempt to make repairs on Pole No. 249 were these: When Strode, as Delta's servant, handed McEntire the clean-up order prepared by Ramsey, there was nothing to indicate that the pole carried "hot" wires. On former occasions similar orders had affirmatively shown that "live" wires were to be dealt with when that condition existed; hence McEntire assumed it would be safe to climb at the time he did to discharge the task assigned.

Appellee testified that when a note was received showing hot wire connections, he marked it "REA," which meant that C & L employes were to do the work. This custom was verified by Lynn Thomasson, C & L manager, who testified that on occasions the Engineer issued such clean-up orders and gave them to Strode, with copies to C & L. Question: "At the time you received these copies did you go immediately and de-energize the line and wait for the work to be done, or did you wait?" Answer: "We would wait for the Superintendent to notify us *when* he would be ready to do that particular job—I mean Strode, Delta's Superintendent." Question: "Tell me whether, to your knowledge, a large

or a small number of clean-up notes would be issued daily?'' Answer: ''. . . After Delta built a line, the Engineers would come back at their convenience, I believe, and make the final inspection—no, not the *final*, [but] *an* inspection. [They would] then issue notes to the Contractor, and then they would go again after they had made the clean-up, to make the final inspection.''

From Thomasson's testimony it would seem that Ramsey, or some one acting for him, had inspected Pole No. 249 and discovered necessity for the repairs later intrusted to McEntire. Ramsey conveyed this information to Strode in a clean-up note.

On the question of prompt attention to such notes, Thomasson said it was possible for Strode or some other Superintendent to receive a clean-up note, attended by failure of the sender to supply C & L with a copy, and still the work might be performed. Question: ''I am talking about a case where you [did] receive a copy—a copy, let us say, that is dated today: was there any way for you to tell when the work would be done by Delta?'' Answer: ''No.''

There was this further testimony by Thomasson: ''I believe you said that a copy of the clean-up notes would be delivered to you?'' Answer: ''That is right. They were supplied by Dickinson & White, [but] came through the mail.'' The copies were retained in the C & L files.

It was Ramsey's practice, or the practice of others acting for Dickinson & White, to show on the clean-up notes, when live wires were to be encountered, that the work ordered to be done was on an ''existing'' pole. To Thomasson such a notation meant that the pole was ''hot.'' When a memorandum of this kind came it was placed in the construction file. There was no further action until the Contractor notified C & L when *that* work would be done. A copy of the notice relating to Pole 249 was actually received by C & L and was placed in the Company's files. Question: ''If you have a copy [of the clean-up note] . . . and there is no notation

saying *existing pole,* would you take that to mean it was a 'cold' pole?'' Answer: ''Yes, sir.'' [Later Thomasson said he did not receive the note in question until after the accident.]

It was C & L's duty to ''deaden'' or ''deënergize'' a pole when information came that it was to be worked ·on. Thomasson verified a statement he made soon after the accident occurred: ''Pole 249 was part of a line turned over to us and energized a year ago. All of [our] employes were, of course, aware of this. Whether the Engineer knew of this, and took it into consideration when having the final work done on this 'tie-in,' I do not know.''

Defending counsel, in addressing the trial Court, argued that there was no evidence showing that Dickinson & White or their employes directed McEntire to work on this pole, or that they had a right to do so. On the contrary, the attorney thought it had been clearly developed that the Engineer's duty was to tell the Contractor ''what remained to be done.'' In other words, said he, the clean-up notes [sent by Ramsey to Strode, and by Strode given to McEntire] were informal in character. They were not orders or ''directives''; neither were they instructions—hence, it was error to assume that the Engineer commanded appellee to work on a specified pole.

*Dangerous Instrumentality—Absolute Liability.*— While Courts in general recognize the dangerous potentiality of electricity, affirmance of this case is reached without extending to those dealing with it the doctrine of non-delegability in respect of construction. There are many situations where a builder like C & L could appropriately pass to another full responsibility to produce a result like the one objectively planned here; nor is there anything in the nature of the work making it impracticable for a promoter or owner to employ engineers in an independent capacity under a contract to inspect and advise, short of participation in means and methods. Many cases involving master and servant, and employer and independent contractor, are cited in *Moore and*

*Chicago Mill & Lumber Co.* v. *Phillips,* 197 Ark. 131, 120 S. W. 2d 722. The principles affirmed in that case are not affected by our findings here that under the facts Dickinson & White—(capable engineers fully competent to let the contract for C & L, and able to apply under the contract all details of inspection requisite to compliance with Delta's commitments)—engaged in managerial activities somewhat in excess of engineering work, as under the contract it became their duty, and served in a *liaison* relationship with the Government, with C & L, and with Delta. Intrusive and overlapping acts compose a course of conduct inconsistent with aloofness from means-and-method participation. This may have been necessary because of the Government's insistence on following its loan to the completed system. In supplying construction cost with one hand, Rural Electrification's fundamental purpose to develop retarded areas with the other, could—from the agency's point of view—be more substantially served by fixing on the borrower express obligations, including a right to say what kind of supervision there should be, and on what evidence the Contractor would be acquitted at work's end. Although the Government contract with C & L is not in the record, these matters are satisfactorily disclosed by portions of the Dickinson & White undertakings on behalf of C & L.

*Specific and General Acts.*—Bearing in mind that No. 249 was an "existing" pole, one energized and in use for·more than a year, some consideration must be given to Dickinson & White's right of interference, or their duty to supervise and make safe, the identical instrumentality that caused injury.

Supplementary to engineering work on the new installations, Dickinson & White were under a duty, in case of necessity, to "rephase," convert, rebuild, or rehabilitate the old lines. *The enumeration of specific duties entrusted to them would not limit the general undertakings.* Assuming that "general undertakings" were those to be implied from the nature of the project, yet collateral to this so-called over-all conception there was a separate contract for construction. It included the in-

spection of materials and rejection of those thought to be inferior, or perhaps a warning to the Contractor that if used in such circumstances, final approval would be withheld. But the *manner* of putting materials into the project, and the workmanship "with which such materials shall be incorporated" were duties imposed on the Engineer. While these words might not of themselves, in all cases, deprive a contract of its independent status, additional support for a three-way tie-in is found in the contract between C & L and Delta.

By affirmative language the Contractor was bound to do some of the same work required of Dickinson & White, that is, "to constantly supervise all work." This was assured by Delta's promise to have a competent Superintendent present "at all times during working hours where the construction is being carried on." Directions and instructions given Delta's Superintendent by Dickinson & White were binding on the Contractor. Not only this, but C & L (*not* Dickinson & White) could remove from the project any person employed by the Contractor if the Engineer thought this action would protect C & L's interests. Finally, the Engineer could require the Contractor to increase the number of employes, augment the equipment used, "or change the amount or kind of tools," etc.—the only condition precedent being that work progress was not satisfactory to the Engineer.

*Independent Contractor, Master and Servant.*—In defining independent contractor, Mr. Justice DONHAM said in *Wilson* v. *Davison,* 197 Ark. 99, 122 S. W. 2d 539, that we had repeatedly held that ". . . it is the right to control and direct that determines whether one is a servant." In support of the statement attention was called to *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Gillihan,* 77 Ark. 551, 92 S. W. 793, where Mr. Justice McCULLOCH's language was: "In general, . . . the liability of the company depends upon whether . . . it has retained control and direction of the work." The Wilson-Davison opinion was handed down Nov. 28, 1938. The Moore-Chicago Mill case, *supra,* came three weeks

later and cited the Gillihan decision, but not *Wilson* v. *Davison*. In April, 1938, which, of course, was before *Wilson* v. *Davison*, Mr. Justice DONHAM wrote the opinion in *Meyer* v. *Moore*, 195 Ark. 1114, 115 S. W. 2d 1087. He quoted Mr. Justice BUTLER's language in *Ice Service Co.* v. *Forbess*, 180 Ark. 253, 21 S. W. 2d 441: ''The conclusion as to the relationship must be drawn from all the circumstances in proof; and, where there is any substantial evidence tending to show that the right of control over the manner of doing the work was reserved, it becomes a question for the jury whether . . . the relationship was that of master and servant.''

In writing the opinion in *Rice* v. *Sheppard*, 205 Ark. 193, 168 S. W. 2d 198, Mr. Justice ROBINS used *Moore Lumber Co.* v. *Starrett*, 170 Ark. 92, 279 S. W. 4, as authority for the proposition that in determining whether a person employed to do a certain task is an independent contractor or a mere servant, the vital test is the control reserved by the employer in respect of the work that is to be done.

Thus, it does not appear that mere retention of the right to require the contract-holder to discharge an unsatisfactory employe, or to increase or decrease the number of those working on the job, is alone sufficient to change what was honestly intended by all parties to be an independent contract, and convert it into a master and servant status. Retention of the right is merely a circumstance to be considered with other evidence. Of course the case would be different if the actual fact of discharge or substitution contributed directly to the injury.

The instructions here left it to the jury to find (a) whether C & L knew that McEntire and others were at work on its lines, or (b) whether, in the exercise of ordinary care, C & L should have anticipated that Delta workers might be at Pole 249 at the time in question; (c) whether Ramsey issued the clean-up notes with the intent that Delta servants should act upon them, and that previously such notes had shown whether wires

on a pole indicated for attention were energized; (d) whether the work order issued by Ramsey was insufficient to put McEntire on notice that the premises were dangerous, and (e) whether, if such failure to warn were found, it constituted negligence when considered with other facts and circumstances, thereby constituting the proximate cause of plaintiff's injuries. If these things were found to be true, and McEntire was not guilty of contributory negligence, a verdict could be rendered against Dickinson & White, and C & L.

It is our view that the course of conduct admitted by Thomasson, when considered with the contracts and other evidence, justified the jury in considering, (a) the consequences that might reasonably have been anticipated when clean-up notes were sent by mail to an address not more than three blocks away; (b) logical inferences arising from C & L's admission that after receiving the notes it would remain inactive until Delta's Superintendent gave a second warning showing with exactness when the danger would be approached; (c) the independent fact that C & L, and its servants only, had a right to neutralize the lines; (d) whether there was causal connection between Ramsey's failure to designate No. 249 as an "existing pole," C & L's admitted practice of awaiting word from Delta *after* certain work had, been indicated, and McEntire's actions in response to the note Strode gave him; (e) whether C & L, as a party to the way "existing" poles were being shown, and cognizant of the risk a worker ran in responding to written directions to work on one, knowingly allowed Delta to disregard its duty to keep a superintendent *constantly* on the job "where work was being done," and finally whether (f) in condoning Delta's neglect to maintain such supervision, and in entrusting collateral duties to Dickinson & White, there was failure to exercise on behalf of appellee that degree of care required by the relative situations of the parties and the facilities each had in respect of the other.

Affirmed.

288

Mr. Justice LEFLAR and Mr. Justice DUNAWAY dissent from the Court's action in affirming the judgment as to C & L Rural Electric Coöperative Corporation. Mr. Justice GEORGE ROSE SMITH did not participate in the consideration or determination of the case.