KINCADE *v.* C. & L. RURAL ELECTRIC COOP. CORP.

5-1097                                                299 S. W. 2d 67

Opinion delivered February 11, 1957.

[Rehearing denied March 18, 1957.]

322

*V. J. Brocato,* Clarksdale, Miss.; *Brockman & Brockman,* for appellant.

*T. S. Lovett, Jr.,* and *J. W. Barron,* for appellee.

J. Seaborn Holt, Associate Justice. Some phases of the present case have been considered and determined in the two former cases of *C&L Rural Electric Co-operative Corporation* v. *McEntire,* 216 Ark. 276, 225 S. W. 2d 941 and *C&L Rural Elec. Coop. Corp.* v. *Kincaid,* 221 Ark. 450, 256 S. W. 2d 337.

On June 19, 1947, appellants (to whom we shall refer as Delta) were engaged under a contract with C&L Rural Electric Co-operative Corporation (to which we shall refer as C&L) in construction of additional electric distribution lines (or extension lines) for C&L to be tied in with some 1,200 miles of C&L's existing system which had been constructed in 1945 and energized in 1946. Dickinson and White were the project engineers employed by C&L and they let the contract for C&L with Delta and supervised the construction. Dickinson and White employed, with C&L's approval, W. A. Ramsey as construction supervising engineer over the project. On June 18, 1947 Ramsey prepared and issued clean-up order 314 for work on a number of poles on the new construction project including pole 249, which he gave to Paul Strode, Delta's superintendent, who worked in cooperation with Ramsey. The next day, June 19, 1947, Strode gave this clean-up order to McEntire, Delta's employee, and directed him to do certain work on pole 249. McEntire, with but two months' experience at the time, proceeded to the pole, and in attempting to perform the work required came in contact with a wire carrying 7,620 volts and was so severely

injured that it was necessary to amputate both of his hands. McEntire then sued C&L, Dickinson and White and Ramsey (engineers) and secured a judgment for $40,000. The judgment was affirmed in *C&L* v. *McEntire*. 216 Ark. 276, 225 S. W. 2d 941. Dickinson and White's insurance carrier paid $5,000 (the extent of its policy liability) on the judgment. C&L had liability coverage with Employers Mutual Liability Insurance Company (appellee) and his company paid $25,000 on the judgment (the limit of its policy liability), plus its *pro rata* share of the interest and cost. C&L paid the balance of $10,000 together with its share of interest and cost. Under the terms of its policy Employers Mutual was subrogated *pro tanto* to the rights of C&L, and has joined C&L in the present suit against Delta on Delta's indemnity agreement with C&L which was a part of the 1947 new construction contract. Delta demurred to appellees' complaint and the trial court sustained its demurrer. On appeal here from the order dismissing appellees' complaint, we reversed (221 Ark. 450, 256 S. W. 2d 337) and remanded with directions to overrule the demurrer and in that case we pointed out: "We must point out that the extent of Delta's liability to C&L on Delta's Indemnity Contract with C&L would be measured by, or depend upon, its degree of negligence, if any, in contributing to McEntire's injury and prorated accordingly." On a trial the court instructed the jury "If you find from a preponderance of the evidence that the defendant, Delta Construction Co., or its agents or employees were negligent and that such negligence, if any, either proximately caused the injury to McEntire or contributed to cause the injury, then you will answer the following question: Using 100% to represent the total or combined negligence of C&L and Delta, if you find Delta was negligent, in causing the injuries to McEntire, what percent of negligence do you find from the evidence is attributable to each of them? In this connection you are instructed to find that C&L was negligent in some percentage, — whatever the evidence may show." The jury returned a verdict finding that Delta was guilty of negligence and assessed its part of the whole at 60%.

From the judgment appellant has appealed and appellee has cross-appealed from that part of the judgment denying interest to them from the date they satisfied the McEntire judgment.

Appellant first argues that to establish Delta's liability under its indemnity contract with C&L that C&L must show ''that Delta was in control of Pole 249 and the electric transmission lines attached thereto on June 19, 1947, at the time McEntire went upon said pole and was hurt . . . that Delta, its agents or employees, committed some act of negligence, while in control, that caused or contributed to McEntire's injury.'' In short, says appellant, ''was the work called for to be done on Pole 249 part of the contract Delta was bound to perform?'' We have concluded that the jury could so find. The construction contract defines Project as follows: ''The term 'Project' shall mean the rural electric distribution system, or portion thereof, described in the Plans and Specifications, construction drawings and maps attached hereto. Article, 7, 1(e), Construction Contract.'' The indemnity contract, upon which the present suit is based, provides: '' (g) The Project, from the commencement of work to completion, or to such earlier date or dates when the Owner may take possession and control in whole or in part as hereinafter provided shall be under the charge and control of the Contractor and during such period of control by the Contractor all risks in connection with the construction of the Project . . . shall be borne by the Contractor . . . The Contractor shall hold the Owner harmless from any and all claims for injuries to persons or for damage to property happening by reason of any negligence on the part of the Contractor or any of the Contractor's agents or employees during the control by the Contractor of the Project or any part thereof.''

Article 8, 1 (f) defines completion as follows: ''The term 'Completion' shall mean full performance by the Contractor of the Contractor's obligations under this contract *and all amendments and revisions thereof.* A certificate of Completion stating the date of completion,

signed by the Engineer and approved in writing by the Administrator, shall be *the sole and conclusive evidence* as to the fact of completion and the date thereof. Portions of the Project shall be deemed to be completed, within the meaning of this provision when they have been completely erected, and have been inspected and accepted in writing, by the Engineer on behalf of the Owner. Thereafter such completed sections may be energized in accordance with the provisions of Article IV, Section 3, at which time the Contractor's liability for maintaining them will cease.'' It appears undisputed that Pole 249, on which McEntire's injury occurred was constructed by Delta under its 1945 contract with C&L, and was a part of C&L's existing system of distribution lines on June 19, 1947, when McEntire received his injuries. It also appears to us equally clear that the control required under the 1947 contract, hereinafter considered, was on the project which included Pole 249, on which McEntire was injured, and on which clean-up work was required under the contract before the project was completed.

The record reflects that shortly before McEntire received his injuries Delta had dead-ended a new tie-in line from the South to Pole 249, and this particular line was deenergized (or cold) when McEntire was injured. It further appears that the line had not been accepted by C&L, nor was it in service when the injury occurred. The evidence further shows that on the day before the injury to McEntire, Ramsey handed to Strode (Delta's superintendent) certain clean-up notes which required certain clean-up work to be done on Pole 249 as a result of the construction of the new tie-in line before this line would be accepted and put in service, or before the project was completed. To do this work it was necessary for McEntire to climb to near the top of Pole 249, lower a down guy, which was on the south side of the pole and move it to the north side. The work also required the completion of an A-6 assembly, which meant to put proper insulators on either side of the pole so that the new tie-in line could be connected with the existing primaries, and finally to anchor the pole. While

on the pole McEntire contacted the live primary wire, which came from the north, carrying 7,620 volts resulting in his injury. It appears undisputed that C&L owned the hot primary wire which extended to the north from Pole 249. The work, however, that McEntire was doing under the clean-up sheet given to him by Strode (Delta's man) was work necessary to be done in order to complete the project under the 1947 contract, and we think the evidence shows that the tie-in line was still under the control of Delta at the time its superintendent, Strode, sent McEntire up on the pole, without first having inspected the pole. It appears that the work sheet which Ramsey handed to Strode, and which work sheet Strode in turn gave to McEntire, directed McEntire to do the clean-up work on Pole 249 but it did not show that the pole was energized, or hot. The evidence further shows that Delta made no inspection of the pole before directing its employee, McEntire, to ascend the pole and do the work required, but appears to have relied upon what the work sheet alone showed. It further appears that Strode had never seen Pole 249, but located it from a plate or a map of the project.

Lynn Thomasson, C&L's manager, testified that the new tie-in line from the south was constructed about two weeks before McEntire's injury and that it was dead-ended into Pole 249 and that this tie-in line had not been turned over to C&L at the time of the injury, that there still remained work to be done on it and it was Delta's line until the project was completed. W. S. Kincade, one of the appellants, testified: ''Q. This tie-line we have been talking about running south from pole 249 hadn't been completed at the time McEntire was hurt, was it? A. No, sir. Q. There remained further work to be done on it by the Contractor, namely, Delta Construction Company, didn't there? A. On? Q. On the tie-line. A. On the tie-line, that is correct. Q. That is correct so that being the situation, Delta had positive control over that tie-line? A. Yes.'' In these circumstances we think there is ample evidence that additional work remained to be done in connection with the tie-in line before it could be accepted by the engi-

neers of C&L and that Delta had control over it within the meaning of the contract provision calling for indemnity, and that the jury was warranted in finding that Delta was negligent and in fixing its degree of fault at 60%.

Next appellant says that our decision in *C&L Rural Elec. Coop.* v. *McEntire, supra,* is the controlling doctrine of law in this case. We do not agree. The law of the case can only apply where the parties are the same. In the original McEntire case the parties were not the same as in the present case. *Stare decisis* has no application here for the reason that the subject matter in the McEntire case is not identical with that in the present case. The McEntire case was a suit in tort for personal injuries and this case being one on contract for indemnity. "The doctrine of the law of the case has no application in cases where the parties are not the same; but the doctrine of *stare decisis* requires the decision on a former appeal in a case between different parties, but involving the same subject matter, be followed, unless there be in the former case palpable error," *Western Union Telegraph Co.* v. *Byrd, Adm'x.,* 197 Ark. 152, 122 S. W. 2d 569.

Appellants also contend that: "The tie-line constructed in May, 1947, was a part of and was included in the construction contract entered into between C&L and Delta on July 14, 1945, and the cause of action thereunder, if any, arose February 13, 1950, . . . and is therefore barred by the five-year statute of limitations."

It appears from ample testimony that Delta received notice in a letter (dated May 17, 1948) from C&L by registered mail of the McEntire tort suit against C&L; that Delta was offered the opportunity to take over and defend that suit, but that it refused to do so. Another registered letter (dated December 21, 1948) was mailed to Delta informing it of the judgment against C&L in the McEntire case, and a return receipt postmarked December 23, 1948 was received by C&L; also a letter from Delta dated January 24, 1949, in response to the De-

cember 21st letter, stating "We would like to advise you that we are disclaiming any liability on this judgment." There was also in evidence the contract C&L entered into with Delta in 1947 authorizing, in effect, the construction and completion of a certain tie-in power line to connect with Pole 249. We think, after reviewing the testimony, that there was substantial evidence that the work was done under the 1947 contract, which was designated Arkansas 21M Lincoln, — Lynn Thomasson so testified. The work calling for the clean-up notes resulted from the stringing of the new tie-in line to Pole 249 from the South. Records of C&L tended to show that part of work order 314 was performed under an amendment to the 1947 contract and Thomasson identified that part as being the tie-in line in question. W. S. Kincade, one of the appellants, admitted he had signed many construction orders showing that work order 314 was at least in part performed under the 1947 contract. One of these orders which he signed was designated Arkansas 21M Lincoln, and when asked whether this designation meant the 1947 contract, he testified: "Q. This is the copy of the 1947 contract, Mr. Kincade, introduced in evidence, is that correct? A. Yes. Q. 'How is it entitled? A. REA Project Arkansas 21M Lincoln. Q. . . . How is line 314 entitled here (referring to the construction order signed by Kincade)? A. You mean this? Q. Yes, sir. A. Project. Q. Project What? A. Arkansas 21M Lincoln. Q. Who signed it? A. I signed all of them."

We hold, without detailing more of the testimony, that there was substantial evidence that the work was done under the 1947 contract and, therefore, the cause of action was not barred by the five-year statute of limitations.

Appellants further contend that: "An indemnity agreement is to be construed as written, and when ambiguity exists, it must be construed against the indemnitee in favor of the indemnitor." Most of appellants argument on this point has been answered, adversely to it above — that is, its contention that C&L was in con-

trol at the time of the injury and the work was being done under the 1945 contract. Nor can we agree that there is any ambiguity in the indemnity contract above, in question here. On this point appellant also argues, in effect, that if the work was done under Amendment No. 1 to the 1947 contract, then there was no liability because this amendment was never approved and, therefore, no contract, and that McEntire's injury occurred prior to the amendment and was not covered by it. We do not agree. The indemnity contract above provides in no uncertain terms that "The term 'Completion' shall mean full performance by the Contractor of the Contractor's obligations under this Contract and all amendments and revisions thereof . . ." So, clearly, the indemnity provision applied to all amendments or revisions of the contract. The record shows that this Amendment No. 1 to the 1947 contract was denominated: "Project—21M Lincoln Request for Construction Contract Amendment No. 1 Date—July 14, 1947. It is addressed to the Administrator of the REA in Washington. It commences: 'The following changes in material and labor cost in the Construction Contract dated February 20, 1947, are hereby submitted for your approval.' It then sets out the data on the original contract, together with the data on the proposed amendment, such as the mileage, signed consumers and costs. It is signed on behalf of C&L by its president. There is a written approval of Dickinson & White, engineers, and also contains the signature of Delta as follows: 'Accepted: Delta Construction Company (Contractor) by W. S. Kincade.' Attached to this Amendment No. 1 is a contract dated December 1, 1947, between C&L and Delta which recites: That Owner and C&L had entered into a contract dated February 20, 1947, for the construction of approximately 265 miles of distribution lines financed by the REA. That the Contractor has commenced the construction of an additional 125 miles of distribution lines without securing the approval of the Administrator." It thus clearly appears that Amendment No. 1 was made a part of the 1947 contract, so that the 1947 contract, affecting the obligations of the par-

ties, was made a part of this Amendment No. 1 and as pointed out the indemnity agreement applied not only to the 1947 contract but to all amendments and revisions.

Another contention of appellants is that: "The Court erred in admitting imcompetent testimony on behalf of the plaintiff; and rejecting competent testimony on behalf of the defendant." We think there is no merit to this contention. It suffices to say that we have reviewed the record and find no prejudiced error in the trial court's actions in permitting or refusing the introduction of evidence.

Errors were also alleged in the giving and refusing to give certain instructions. It would unduly extend this opinion to enter upon a discussion of them. We have, however, considered them all and find no error. Other alleged errors have not been overlooked, but on consideration we find all to be untenable. Accordingly, the judgment is affirmed on direct appeal.

On appellees' cross-complaint we have concluded that their contention that the trial court erred in denying them interest at 6% on the McEntire judgment from the date they paid it, February 13, 1950, must be sustained. It is unquestioned here that appellees paid the McEntire judgment, and on that date Delta became liable to them on the indemnity agreement. The jury determined that Delta was liable for 60% of the money that appellees paid from their own money for Delta, so Delta has had the use of appellees' money, and fairness and justice demand that Delta pay interest (6% the legal rate) on this money of which appellees have been deprived. The fact that we are dealing with an unliquidated demand is not controlling. "As a necessary part of his damages an indemnitee may recover against his indemnitor interest . . ." 27 Am. Jur. Indemnity, § 27, p. 473. *Miller* v. *Robertson,* 266 U. S. 243, 257, 69 L. Ed. 265, 45 S. Ct. 73: "Compensation is a fundamental principle of damages, whether the action is in contract or in tort . . . One who fails to perform his contract is justly bound to make good all damages

that may accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract." *Loomis* v. *Loomis,* 221 Ark. 743, 255 S. W. 2d 671, "Yet when the defendant is actually in default there are many instances in which interest is allowed even though the precise extent of his liability is not determined until the trial. For example, a defendant's liability for breach of a contract to pay a definite sum of money may be uncertain, for the default may have saved the plaintiff the expense of full performance on his own part, and that saving may be a matter for the jury to determine. In spite of this uncertainty interest is recoverable from the date of the breach." *Public Market Co. of Portland* v. *City of Portland, et al.,* 171 Or. 522, 138 P. 2d 916, 918, ". . . We are of the opinion, moreover, that the fact that the damages are unliquidated is not necessarily a bar to the allowance of interest, and that 'no right reason exists for drawing an arbitrary distinction, between liquidated and unliquidated damages.' . . . The tendency of modern authority is to disregard such a distinction." *American Law Reports, Annotated,* 27 A. L. R. 2d, Annotation, § 8, p. 1276, "Interest from the date of payment of a joint judgment has been held properly allowable to a tortfeasor on the outlay thus made on behalf of the other joint tortfeasors." 42 C. J. S. § 13 c. Interest, p. 585, "As a general rule an indemnitee who has been compelled to pay a debt or liability against which he is indemnified is entitled to recover interest on the amount paid, from the time of payment or, as it has been held, from the date of the judgment against him, from the time the loss was definitely settled, or from judicial demand . . ."

So, on appellees' cross appeal the judgment in so far as it denies interest will be modified so as to allow interest and as so modified it is affirmed.

Justice GEORGE ROSE SMITH not participating.