Harvey JONES and H.G. Frost, Jr., guardian ad litem, Appellee,

v.

SUN CARRIERS, INC., Appellant.

No. 87–1767.

United States Court of Appeals, Eighth Circuit.

Submitted March 18, 1988.

Decided Sept. 8, 1988.

Thomas A. Masterson, Philadelphia, Pa., for appellant.

Robert Shults, Little Rock, Ark., for appellee.

Before McMILLIAN, WOLLMAN, and BEAM, Circuit Judges.

WOLLMAN, Circuit Judge.

Harvey Jones brought this contract action against Sun Carriers, Inc. (Sun) seeking a declaratory judgment that he is not required to indemnify Sun for the dioxin contamination of the Jones Truck Lines, Inc. (JTL) terminal and that escrowed shares of Sun Company, Inc. stock should therefore be released to him. Sun counterclaimed, alleging that Jones had breached warranties made to Sun when Sun purchased JTL and that the stock should remain in escrow to secure the resulting liabilities in excess of $500,000. The district court[1] granted Jones' motion for summary judgment and denied Sun's cross-motion for summary judgment. Sun now appeals from the judgment. We affirm.

**I.**

Jones sold all of the outstanding shares of his trucking company, JTL, to Sun in exchange for shares of Sun Company, Inc. stock worth approximately $45 million. Jones made various representations and warranties to Sun in the stock purchase agreement concerning JTL's financial condition. The warranty provision, found in section 3(i) of the agreement, provides that "[JTL] has no liabilities or obligations except those set forth in the September 30, 1979 Financial Statements (as audited) or those incurred, consistent with past business practice, in the ordinary course of business since September 30, 1979." Section 3(i) goes on to define "liabilities or obligations":

> For the purposes of this Agreement, the term *"liabilities or obligations"* shall include, without limitation: any direct or indirect indebtedness, claim, loss, damage, deficiency (including deferred income tax or other net tax deficiencies), cost, expense, obligation, guarantee or responsibility, *whether accrued, absolute or contingent, known or unknown, fixed or unfixed, liquidated or unliquidated, secured or unsecured.* (Emphasis added.)

Additionally, in section 7(a) of the stock purchase agreement, Jones agreed to indemnify and hold harmless Sun and JTL against the following:

> [A]ny and all *damages, losses, deficiencies, liabilities, claims, costs and expenses* * * * arising out of any misrepresentation, breach of warranty or nonfulfillment of any covenant on the part of [JTL] or Seller under this Agreement or from any misrepresentation in or omis-

---

1. The Honorable William R. Overton, late a United States District Judge for the Western District of Arkansas.

sion from any certificate [or] financial statement * * *. (Emphasis added.)

The indemnity provision further provides that Sun must assert its claims for indemnity within three years after the closing date, and that Jones' obligation to indemnify Sun will not arise until the aggregate of all claims exceeds $500,000. The parties executed an escrow agreement under which they delivered a certificate representing 10% of the shares of Sun stock comprising the purchase price to an escrow agent to secure the representations and warranties outlined in the stock purchase agreement. The parties closed the sale of JTL on April 29, 1980.

On October 29, 1982, the Environmental Protection Agency (EPA) informed JTL that its terminal in St. Louis may have been sprayed with waste oils contaminated with dioxin. The EPA indicated that it had not investigated the property and did not know whether a problem existed.[2] In fact, in 1970 or 1971, JTL had hired Russell Bliss, an independent contractor, to spray the terminal with waste oil for dust control purposes. Unknown to Jones, this waste oil was contaminated with 2, 3, 7, 8, tetra-chlorodibenzo-p-dioxin.

On December 6, 1982, the EPA sent Sun's attorney a letter requesting permission to enter the JTL property to perform tests for dioxin and to examine records of work that Bliss had performed. The EPA later issued a press advisory indicating that the JTL terminal was a potential site contaminated by dioxin.

On April 20, 1983, Sun notified Jones that it was asserting indemnity claims for "potential" liabilities related to the dioxin contamination that might exceed several million dollars. The letter stated in part:

As a result of this dioxin contamination, JTL is faced with substantial *poten-*

*tial* liabilities. While it is not yet possible to estimate the amount of these liabilities, they may exceed several million dollars, considering the *potential* cost of the remedies available (e.g., the costs of decontamination, closure, relocation, business interruption, etc.), and, in addition, the *potential* costs of employee claims, third-party claims, etc. (Emphasis added.)

Although these dioxin-related liabilities of JTL result from events occurring prior to the date of the Stock Purchase Agreement, they were not disclosed in the audited September 30, 1979, Financial Statements of JTL. As you know, Sun Carriers relied on these financial statements upon entering into the Stock Purchase agreement with you. We also relied on the relevant representations and warranties you made in Sections 3(i) and 3(k) of the Stock Purchase Agreement to value the capital stock of JTL and agree upon a purchase price.

A few days later, Sun also submitted claims totaling $180,797 unrelated to the dioxin contamination. These were the main events that occurred before the April 29, 1983, cutoff date.

Subsequently, the EPA classified the JTL terminal as a confirmed dioxin site. The Department of Health and Human Services recommended that the entire superstructure of the dock and maintenance shop be vacuumed with a hazardous material vacuum cleaner and be washed down with a solution of water and detergent, but did not recommend that the site be vacated. A JTL employee and the widow of another employee filed worker's compensation claims alleging that these employees had developed cancer from exposure to the dioxin.

---

**2.** The letter from the EPA stated in part:
During the past several months, the U.S. Environmental Protection Agency (EPA) has been compiling a list of properties in eastern Missouri which, in the late 1960's and early 1970's, may have been sprayed with waste oil for dust control or other purposes. * * * Our interest stems from the fact that some of the waste oil used for spraying contained small amounts of a hazardous substance known as

dioxin. As you may be aware, EPA has identified Jones Truck Lines on Hall Street in St. Louis, Missouri as one of those locations which may have been sprayed with contaminated waste oil or which may have received fill dirt contaminated by spraying.
To date we have not investigated your property and therefore have no indication that any problem in fact exists there.

On December 9, 1985, Jones notified Sun that he disputed its claims for indemnification. Jones then filed suit seeking to have the Sun shares in escrow released to him. The district court granted Jones' motion for summary judgment, concluding that no breach of contract had occurred and that the indemnification provision did not cover potential claims.

## II.

On appeal, Sun argues that the court did not follow established rules of contract interpretation and that this appeal presents questions of law over which we should exercise plenary review. Jones responds that the district court's interpretation of Arkansas law[3] is entitled to substantial deference.

■ In diversity cases, we give great weight to a district court's decisions on state law questions. *Havens Steel Co. v. Randolph Engineering Co.*, 813 F.2d 186, 188 (8th Cir.1987). We will reverse only if the judge's interpretation of state law of the forum in which he sits is "fundamentally deficient in analysis or otherwise lacking in reasoned authority." *Ancom, Inc. v. E.R. Squibb & Sons, Inc.*, 658 F.2d 650, 654 (8th Cir.1981). We agree with Jones that the district court correctly applied Arkansas precedent.

■ The leading Arkansas case discussing the scope of indemnity agreements is *Weaver–Bailey Contractors, Inc. v. Fiske–Carter Constr. Co.*, 9 Ark.App. 192, 657 S.W.2d 209 (1983), in which the court announced the following rule:

[I]n contracts of indemnity the losses to be indemnified must be clearly stated and the intent of the indemnitor's obligation to indemnify against them must be expressed in clear and unequivocal terms and to such an extent that no other meaning can be ascribed. The intent to extend the obligation to losses from specific causes need not be in any particular language, but unless this intention is expressed in the plainest words

it will not be deemed that the party undertook to indemnify against it.

*Id.* 657 S.W.2d at 210 (citations omitted); *see also Fidelity & Casualty Co. v. J.A. Jones Constr. Co.*, 325 F.2d 605, 607 (8th Cir.1963) (language must clearly and definitely show intention to indemnify against loss or liability involved). Relying on *Weaver–Bailey*, the district court concluded that the indemnity provision in the stock purchase agreement was too uncertain and indefinite to entitle Sun to indemnification for the potential claims that might arise out of the dioxin contamination.

The indemnity provision provides that before Sun may recover against Jones, the nonfulfillment of a covenant must result in "damages," "losses," "deficiencies," "liabilities," "claims," or "costs and expenses," that exceed $500,000 within three years of closing. Under general indemnity law, these terms describe when an indemnitor's obligation accrues. For example, an indemnitor's obligation for "damages," "losses," "costs and expenses," does not accrue until the indemnitee has actually made a payment or has otherwise actually expended sums. *See Larson Machine, Inc. v. Wallace*, 268 Ark. 192, 600 S.W.2d 1, 13 (1980); *Kincade v. C & L Rural Elec. Cooperative Corp.*, 227 Ark. 321, 299 S.W. 2d 67, 73 (1957); *C & L Rural Elec. Cooperative Corp. v. American Casualty Co.*, 199 F.Supp. 220, 222 (E.D.Ark.1961) ("It is a well settled principle that a cause of action for indemnity * * * accrues when the obligee suffers actual damage including financial loss occasioned by the payment of money."); *see generally*, Woods, *Some Observations on Contribution and Indemnity*, 38 Ark.L.Rev. 43, 67 (1984).

In contrast, an indemnitor's obligation for "liabilities" arises before sums are actually expended. It accrues when liability is legally imposed, such as when a judgment is entered or a settlement is reached. *See Armstrong v. Alabama Power Co.*, 667 F.2d 1385, 1388 (11th Cir.1982); *Trapp v. R–Vec Corp.*, 359 N.W.2d 323, 327 (Minn.App.1984). At the farthest end of the continuum, a contract to indemnify for

---

**3.** Section 14 of the stock purchase agreement  provides that Arkansas law governs.

any "claim" accrues when a third party has merely instituted a suit. 41 Am.Jur.2d *Indemnity* § 31 (1968). Sun offers various reasons why we should employ more expansive definitions of the terms "liabilities," "damages," and "claims" than generally used under indemnity law.

### 1. *Liabilities*

Sun first contends that the stock purchase agreement uses a more expansive definition of the term "liabilities" than do general indemnity contracts. Sun argues that here, unlike in *Weaver–Bailey*, the warranties and covenants in section 3(i) of the stock purchase agreement clearly express the intent of the parties to indemnify Sun for unknown, unforeseen liabilities and that Arkansas law is not hostile to indemnity agreements that clearly shift the risk of unknown and unfixed liabilities to the indemnitor.

Under Sun's construction of the contract, the definition of the word "liabilities" for which Jones agreed to indemnify Sun and JTL is found in the warranty provision of section 3(i), which defines the term "liabilities or obligations" for the purpose of the stock purchase agreement as any "claim, loss, damage, * * * whether accrued, absolute or contingent, known or unknown, fixed or unfixed, liquidated or unliquidated, secured or unsecured." The dioxin contamination, Sun argues, constitutes an unknown, contingent liability that the drafters of the stock purchase agreement contemplated and shifted the risk of to Jones. Because Jones' guardian ad litem, H.G. Frost, Jr., admitted in his deposition that had the contamination of the JTL terminal been known at the time of the sale it would have been included in the September 30, 1979, financial statement as a problem, Sun argues that it is a contingent liability for which it is entitled to indemnification.

Jones responds that he did not agree to indemnify Sun for contingent liabilities beyond the three-year period. He argues that for Sun to prevail the definition of the term "liabilities or obligations" in the warranty provision must be applied to the word "liabilities" in the indemnity provision. The district court held that because the phrase "liabilities or obligations" is set off in quotation marks, it is not synonymous with the word "liabilities" used in the indemnity section. Instead, the phrase "liabilities or obligations" defines only the items which Jones represented were described in the September 30, 1979, financial statements.[4] Because the term "liabilities or obligations" is not used in the indemnity provision, Jones argues that he did not indemnify Sun and JTL against the contingent, unknown liability resulting from the dioxin contamination. We agree.

A basic tenant of contract law is that each word in the agreement should be interpreted to have a meaning, rather than to be redundant and superfluous. *Fowler v. Unionaid Life Ins. Co.*, 180 Ark. 140, 20 S.W.2d 611, 613 (1929). If "liabilities" in the indemnity section is held to have the same meaning as "liabilities or obligations," as used in the warranty section, which includes "any claim, loss, damage, deficiency, cost, expense, obligation, guarantee or responsibility," then the words "claims," "losses," "damages," "deficiencies," "costs and expenses" employed in the indemnity section would be redundant.

Furthermore, under the principle of Arkansas indemnity law set forth in *Weaver–Bailey*, if the parties intended that the word "liabilities" in the indemnity provision would not have the meaning generally accorded it in indemnity contracts, they should have indicated their intention clearly, unequivocally, and to such an extent that no other meaning could be ascribed to

---

**4.** Sun argues that the district court's construction of "liabilities or obligations" attributes no meaning to it. The parties would not have defined terms and then not used them throughout the stock purchase agreement. Jones correctly points out, however, that the term is used in other parts of the contract. Sun further argues that because the parties used the disjunctive "or" anytime either the word "liabilities" or the word "obligations" is used, "liabilities" has the meaning defined in the warranty section. Although this is a plausible reading of the contract, in light of other considerations discussed above the district court's conclusion is more persuasive.

the term. This they failed to do. Because Sun has not met its burden of proving that its construction of the contract is unequivocally what the parties intended, we affirm the district court's holding that Jones did not agree to indemnify Sun for the unknown, contigent liability of the dioxin contamination.

### 2. *Damages*

Sun next contends that it suffered damage in the early 1970s when Russell Bliss sprayed dioxin-contaminated waste oils on the JTL terminal grounds. As set forth above, however, Arkansas law damages are deemed to have accrued only when the indemnitee has made payment or has otherwise expended money.

### 3. *Claims*

Sun's final contention is that its notice to Jones of the facts related to the potential dioxin contamination of the JTL terminal constitutes a claim. The district court rejected this contention, concluding that such facts gave rise only to potential claims. The court also noted that at the time of trial, seven years after the parties had executed the contract, the boundaries of Sun's claims for indemnity were still uncertain. The court reasoned, "I just can't believe the parties would enter into an agreement which would leave something up in the air for that period of time. Certainly, I don't think they would intentionally do that." Transcript at 45.

Sun argues that the district court erroneously based its decision on a surmise regarding the parties' intentions. Pointing to two provisions of the escrow agreement, Sun argues that the parties anticipated that its claims for indemnity might not be resolved within the three-year notification period. First, section 5(a) of the escrow agreement outlining the procedure for asserting claims states that Sun need only give an estimated amount of the claim to the extent feasible at the time. Second, section 6 of the escrow agreement provides that the escrow agent shall retain sufficient funds in the escrow account after the three-year period to settle claims between Jones and Sun that are still in dispute. Sun argues that the district court's apparent conclusion that all claims had to be certain within three years is irreconcilable with the escrow agreement and eviserates Sun's contractual right to assert claims of only estimated amounts.

Because no Arkansas case addresses what constitutes a claim for purposes of an indemnity contract, we give great deference to the district court's determination that here the indemnity provision does not cover potential claims. Generally, no claim arises under an indemnity agreement until a specific demand is made for something as a legal right or until notice of a lawsuit is given. Merely discovering facts during the indemnity period that raise the specter of potential claims is insufficient. *Christy v. Menasha Corp.*, 297 Minn. 334, 211 N.W.2d 773, 777 n. 2 (1973), *overruled on other grounds*, 281 N.W.2d 838 (Minn.1979). *See also Taylor v. United Missouri Bank*, 693 F.2d 63, 65 (8th Cir.1982) ("Under even the broadest definition, a claim requires that one exercise [a] legal right by an affirmative act or demand for payments due.") Here, no potential plaintiffs had made any claims against Sun or JTL by the cutoff date, and the EPA had taken no action that would rise to the level of a claim. The EPA had merely identified the JTL terminal as a potential dioxin site.

Sun nevertheless argues that its notice to Jones of the dioxin contamination of the JTL terminal is analogous to a notice that a catastrophic truck accident, allegedly caused by a JTL truck, had occurred before the sale of JTL and that lives and property of an undetermined value had been lost, although none of the prospective plaintiffs had filed suit. Jones' counsel conceded at the summary judgment hearing that had the prospective plaintiffs made a specific statement of a basis for liability, Sun would be entitled to indemnity for its eventual losses.

The weakness in Sun's analogy is that the EPA first notified Sun that the JTL terminal was a confirmed dioxin site on May 3, 1983—several days after the period for indemnity had expired. Although

Jones concedes that third-party claims against Sun did not have to be resolved by the cutoff date, he correctly argues that such claims did, however, need to be asserted. Jones did not agree to indemnify Sun for unasserted claims or potential liabilities. Because the EPA had not concluded its tests before the expiration of the indemnity period, we conclude that the district court correctly determined that the EPA had not asserted an actual claim against Sun or JTL.

We therefore hold that none of the items of indemnity listed in section 7 of the stock purchase agreement occurred before the period of indemnity expired.[5]

Accordingly, the judgment is affirmed.

---

**5.** Because we conclude that no event giving rise to indemnity had occurred before the cutoff date, we need not reach the question of whether the district court correctly held that there was no breach of contract.