**D. A. HARMON and American Motorists Insurance Company, Plaintiffs,**

v.

**ROBBERSON STEEL COMPANY, a Delaware Corporation, Defendant.**

**Civ. A. 1361.**

United States District Court
W. D. Arkansas,
Ft. Smith Division.
Jan. 7, 1958.

**628**

Pierce, Mock & Duncan, Lytle, Johnston & Soule, Oklahoma City, Okl., Wright, Harrison, Lindsey & Upton, Little Rock, Ark., for plaintiff.

Looney, Watts, Looney & Nichols, Oklahoma City, Okl., Shaw, Jones & Shaw, Fort Smith, Ark., Rex Perkins, Fayetteville, Ark., for defendant.

JOHN E. MILLER, District Judge.

The plaintiff, D. A. Harmon, filed his complaint on March 16, 1957, in the Circuit Court of Washington County, Arkansas, in which he alleged:

That prior to June 2, 1954, he, as general contractor, was engaged in the construction of a field house for the University of Arkansas at Fayetteville, Arkansas; that on said date he and the defendant, Robberson Steel Company, entered into two written agreements, one being a "Subdealer's Purchase Order" and the other a "Sub-Contract Agreement". The "Subdealer's Purchase Order" provided, inter alia, that the defendant was to fabricate and furnish certain materials for the construction of the said field house. The "Sub-Contract Agreement" provided, inter alia, that the defendant would "furnish and pay for all labor and perform in a good and workmanlike manner all work necessary to complete the unloading and erecting of all structural steel required in connection with the construction of the field house for the University of Arkansas".

Subsequent to June 2, 1954, the defendant entered into a "Sub-Contract Agreement" with Jesse L. Bailey, d/b/a Bailey Steel Construction Company, for the unloading and erecting of the structural steel.

On November 15, 1954, while the agreements between the plaintiff Harmon and the defendant were in full force and effect, and during the erection of the structural steel for the field house, that portion of the structural steel then in place collapsed, fatally injuring one man and causing serious personal injury to four other men, all being employees of Bailey Steel Construction Company.

That in addition to the death of one of the employees and the personal injuries to the four others, the collapse of the structural steel caused damage to plaintiff in the total sum of $8,527.66.

Subsequent to the death of the one employee and the injuries to the other four employees of Bailey Steel Construction Company, separate suits were filed in the Circuit Court of Washington County against plaintiff, D. A. Harmon, the defendant, Robberson Steel Company, and the architects, to recover damages for the death and injury of the employees. The plaintiff Harmon made demand upon defendant that it defend the said suits, and hold the said D. A. Harmon harmless from any loss, cost or expense in connection with said suits but the defendant refused to do so.

On August 8, 1956, the five damage suits then pending in the Circuit Court of Washington County, Arkansas, were compromised and settled. That as a contribution to the settlement, the plaintiff Harmon paid the sum of $50,000; that said settlement was entered into upon a specific written agreement between plaintiff Harmon and the defendant that the amount of the settlement was fair and reasonable, that neither Harmon nor Robberson Steel Company admitted any liability by entering into said agreement, and "that the said settlement was without prejudice to any claims that D. A. Harmon might have against Robberson Steel Company by reason of the sub-contract agreement". That in addition to the contribution of $50,000 on the part of the plaintiff to the settlement of said personal injury suits, the said plaintiff incurred expenses in excess of $10,000 in connection with the defense of said personal injury suits.

The complaint in paragraph 10 enumerates the items of damages, totaling $8,527.66, which the plaintiff claims

were caused by the collapse of the structural steel.

The plaintiff further alleged that by the terms of the "Sub-Contract Agreement" he is entitled to recover from the defendant a total sum of $68,527.66, being comprised of the sum of $8,527.66, $50,000 contribution to settlement of personal injury cases, and $10,000 cost of defending the personal injury cases.

In paragraph 13 of the complaint the plaintiff alleged in the alternative that the collapse of the structural steel and the resulting cost, loss, expense, and damage to the plaintiff was occasioned by the act or neglect, and the negligence of Bailey Steel Construction Company, its agents, servants or employees, and that for the purpose of the performance of the work Bailey Steel Construction Company was an agent of the defendant and was negligent and careless in adopting the method used for the erection of the structural steel, in failing to provide adequate shoring or bracing for the steel, and in attempting to force one of the members into position in such a manner as to create a vibration throughout the entire structure, when they knew, or ought to have known in the exercise of ordinary care that a collapse of the structure might result; that the negligence of Bailey Steel Construction Company, its agents, servants or employees, was a proximate cause of the collapse of the structural steel, and that plaintiff is entitled to recover from the defendant under the terms of the "Sub-Contract Agreement" the said sum of $68,527.66.

In paragraph 14 of the complaint the plaintiff further alleged in the alternative that the collapse of the structural steel was caused by negligence on the part of the defendant, its agents, servants and employees in that they negligently and carelessly failed to fabricate the steel in accordance with the plans and specifications, and failed to supervise the method of erection being used by Bailey Steel Construction Company, and in failing to require Bailey Steel Construction Company to provide adequate and sufficient shoring and bracing of the steel in place; that the said negligence of the defendant was a proximate cause of the collapse of the structural steel, and that plaintiff is entitled to recover the said sum of $68,527.66.

In due time the cause was removed to this Court, and on May 16, 1957, the defendant filed its answer and counterclaim.

In the answer the defendant admitted that plaintiff had contributed $50,000 to the settlement of the claims and suits for personal injuries referred to in the complaint, but alleged that it had no knowledge or information as to the expenses incurred by the plaintiff in connection with the defense of the personal injury suits in the Circuit Court of Washington County, Arkansas.

Admitted the correctness of the amount of damages claimed by plaintiff in the sum of $8,527.66, but denied that it was liable to plaintiff for such damages.

Denied that the loss, damage and expense allegedly suffered by plaintiff resulted from the performance of the work covered by the "Sub-Contract Agreement", and "states that such loss, damage and expense was proximately caused by the negligence of plaintiff". Denied that the alleged negligence of Bailey Steel Construction Company was "the proximate cause of the collapse of the structural steel" and alleged that the proximate cause of such collapse was the negligence of plaintiff.

The defendant denied that it was guilty of negligence in any particular as alleged by plaintiff, "and denies that the alleged negligence of this defendant was the proximate cause of the collapse of the structural steel referred to therein. Defendant states that the proximate cause of such collapse was the negligence of plaintiff in the particulars hereinafter set forth".

The defendant further alleged:

"Plaintiff is not the real party in interest as to the $50,000 allowed in its complaint which has been expended in settlement of personal in-

jury and death cases, which settlements were actually made by plaintiff's insurance carrier, the American Motorists Insurance Company, which company is a necessary party to this action."

The defendant further alleged that the collapse of the structural steel was proximately caused, or, in the alternative was contributed to by the negligence of the plaintiff in the following particulars:

"1. As prime-contractor, it was the duty of D. A. Harmon to co-ordinate and supervise the work of sub-contractors; and to furnish to sub-contractors, in proper sequence, the work site, in suitable and proper condition for performance of the work of sub-contractors.

"2. As part of preparation of the work site by plaintiff for erection of steel rigid frames by Bailey Steel Construction Company, the plaintiff was required to construct concrete foundations for support of the base of each frame; and failed to properly prepare and construct the concrete foundations in the following particulars:

"a. The plaintiff failed to permit the concrete to set for a sufficient length of time to properly cure and attain a proper degree of hardness before turning over the same to Bailey Steel Construction Company for erection of the rigid frames.

"b. The plaintiff set steel anchor bolts in the foundations improperly; and, especially in the foundation supporting the northwest column of the building, the anchor bolts were set too deeply in the concrete, so that the ends of the bolts extending above the concrete were too short to anchor down the rigid frames. Plaintiff, thereupon, negligently and carelessly extended the anchor bolts by welding extensions thereon.

"c. Plaintiff was further negligent in that the welding between the anchor bolts and extensions thereon was improperly performed, with only the outside circumference of metal between the original bolts and the extensions connected by a weld, so that only a thin shell of metal held the extension onto the anchor bolt.

"d. Plaintiff knew, or by the exercise of ordinary care should have known, that the anchor bolts were intended to withstand great stresses and strain, especially during the erection phase of the steel framework of the building, and that the anchor bolts as extended, were inadequate to serve the purpose for which they were designed.

"e. The plaintiff failed to advise or warn this defendant, or the Bailey Steel Construction Company of the unsafe and inadequate anchor bolts (that) had been installed in the concrete foundations, well knowing that the Bailey Steel Construction Company would rely upon safe and adequate anchor bolts having been installed, and perform its steel erection procedure accordingly."

That by reason of the negligence of plaintiff which proximately caused or contributed to the collapse of the structural steel, "plaintiff is precluded from recovering in this cause under the indemnity agreement referred to in paragraph 11 of plaintiff's complaint and under the allegations of negligence, as alleged in paragraphs 13 and 14 of plaintiff's complaint".

By counterclaim the defendant alleged that by reason of the negligence of plaintiff the defendant sustained damages in the total sum of $52,445.17 as the cost of repairing damaged steel, replacing it in position, and paying expenses necessarily incurred as a result of the collapse of the said steel.

That the Liberty Mutual Insurance Company, liability insurer for the defendant, paid the sum of $50,000 as a contribution toward the settlement of the death case and the personal injury cases in the Circuit Court of Washington County, Arkansas, "which this defend-

ant is entitled to recover, for and on behalf of the Liberty Mutual Insurance Company".

The defendant prayed that it recover from the plaintiff the said sum of $52,-445.17, and the additional sum of $50,000 expended by the Liberty Mutual Insurance Company, insurance carrier of the defendant.

On June 4, 1957, the plaintiff Harmon filed his reply to the counterclaim in which he admitted that the defendant had incurred expense and suffered damages as a result of the collapse of the structural steel, but that he is "without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the extent of such expense and damage and therefore denies that the defendant suffered expense and damage in the amount alleged in the counterclaim".

The plaintiff admitted that the Liberty Mutual Insurance Company paid the sum of $50,000 as a contribution toward settlement of the damage suits in the Circuit Court of Washington County, but denied that the defendant or Liberty Mutual Insurance Company was entitled to recover such sum from the plaintiff.

The plaintiff further alleged in his reply that by the terms of an agreement entered into between him and the defendant on August 9, 1956, that "Robberson Steel Company specifically waives and releases any claim against D. A. Harmon based upon the contribution by Robberson Steel Company to the settlement with the plaintiffs in the said lawsuits".

On July 11, 1957, plaintiff filed his motion for summary judgment, to which defendant filed its response on July 26, 1957, and on August 2, 1957, the Court denied plaintiff's motion for summary judgment, and set the case for a pretrial conference on August 13, 1957. At the pretrial conference the defendant dismissed and struck from its counterclaim sub-paragraph 2 of paragraph 2, and also sub-paragraph 2 of the prayer of the counterclaim; or, in other words, the claim for the recovery of the $50,000 contributed by the Liberty Mutual Insurance Company, insurance carrier of defendant, to the settlement of the damage suits in the Circuit Court of Washington County, Arkansas, was withdrawn.

On August 26, 1957, the plaintiff, D. A. Harmon, filed his motion for permission to amend his complaint and to make American Motorists Insurance Company a party plaintiff in the action, which motion was granted on the same date, and in the amendment it was alleged that the said American Motorists Insurance Company, as liability insurance carrier for plaintiff, paid $50,000 in the settlement of the damage suits in the Washington County Circuit Court and incurred expense in the defense of said suits in the sum of $10,000.

It was further alleged in the amendment:

"All of said sums paid by American Motorists Insurance Company were paid on behalf of D. A. Harmon and because of an independent contractual relationship between D. A. Harmon and American Motorists Insurance Company. Because of the nature of the contractual arrangement between D. A. Harmon and American Motorists Insurance Company and the basis upon which premiums were paid by D. A. Harmon to American Motorists Insurance Company, although the actual payments in a total sum in excess of Sixty Thousand Dollars ($60,000.-00) were made by American Motorists Insurance Company, the burden of such payments was borne, at least in part, by D. A. Harmon."

The prayer of the amendment was that the plaintiffs, Harmon and American Motorists Insurance Company, recover from defendant the total sum of $68,-527.66.

The defendant did not file any answer to the amendment to the complaint.

At the beginning of the trial the defendant reduced his counterclaim for $52,445.17 to $47,273.50.

The case was tried to the Court without the intervention of a jury on November 25, 26, and 27, 1957. At the conclusion of the trial the case was submitted and taken under advisement, and the attorneys for the parties were granted time in which to prepare, serve and file briefs in support of their respective contentions. The briefs have been received and considered along with the record and all the testimony adduced at the trial, and the Court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## Findings of Fact

### 1

The plaintiff, D. A. Harmon, is an individual resident and citizen of the State of Oklahoma. The plaintiff, American Motorists Insurance Company, is a corporation organized and existing under the laws of the State of Illinois, and is authorized to do business in Arkansas.

The defendant, Robberson Steel Company, is a corporation organized and existing under the laws of the State of Delaware, and is authorized to do business in the State of Arkansas.

The amount involved herein exceeds the sum of $3,000, exclusive of interest and costs.

### 2

On June 2, 1954, the plaintiff, D. A. Harmon, as general contractor, was engaged in the construction of a field house for the University of Arkansas at Fayetteville, Arkansas, and entered into two agreements with defendant, Robberson Steel Company. Plaintiff's Exhibit No. 1 is a copy of the "Sub-Contract Agreement", and paragraph 5 of said sub-contract, inter alia, provides:

"* * * Sub-Contractor (defendant) * * *, notwithstanding any insurance that may be provided for or carried, agrees to be responsible for and indemnifies and agrees to hold Contractor harmless from any loss, injury or damage, either to persons or property, arising out of or resulting from the performance by Sub-Contractor of the work cov-

ered by this sub-contract or occasioned by the act or neglect of Sub-Contractor or his agents, Servants or employees."

Paragraph 3 provides:

"Sub-Contractor agrees to be responsible for and protect the work to be performed under this sub-contract until accepted in full by the Owner and Architect."

Plaintiff's Exhibit No. 2 is a copy of the purchase order, by the terms of which and for a valuable consideration the defendant agreed to furnish "all structural steel, reinforcing steel and accessories, wire mesh and miscellaneous metals as noted hereinafter required in the construction of the above project in strict accordance with plans and specifications".

### 3

Subsequent to June 2, 1954, and on or about June 30, 1954, the defendant entered into a written contract with Jesse L. Bailey, doing business as Bailey Steel Construction Company, in which the latter agreed to erect the rigid steel frame of the field house in accordance with such instructions, plans, specifications and drawings as might be submitted to him by the defendant. Neither party introduced that contract in evidence.

### 4

In the afternoon of November 15, 1954, while the agreements between plaintiff Harmon and defendant were in full force and effect, the employees of Bailey Steel Construction Company were engaged in the erection of the structural steel. A portion of the structural steel then in place collapsed, and one of the workmen received injuries from which he died, and four other workmen received serious personal injuries.

The personal representative of the deceased employee and the four other injured employees, individually, on October 5, 1955, filed separate suits in the Circuit Court of Washington County, Arkansas, at Fayetteville, Arkansas, against the plaintiff herein, D. A. Harmon, and the defendant herein, Robberson Steel Company, a corporation, and

the architects, seeking to recover damages for the injuries received by the deceased and the others because of the collapse of the structural steel. Copies of the complaints filed by the personal representative of the deceased and by the four others were introduced as plaintiffs' Exhibits 4–A, 4–B, 4–C, 4–D, and 4–E.

It was alleged in each of the complaints that the injuries were caused by the joint and concurrent negligence of D. A. Harmon and the Robberson Steel Company. By specific allegations certain acts of negligence were alleged against each of them, but the prayer for judgment was against all of the defendants, including the architects, who are not involved herein.

On August 9, 1956, the damage suits were settled and at that time plaintiff Harmon and the defendant entered into a written contract which was introduced as plaintiffs' Exhibit No. 3.

The said contract provides:

"It is the desire of D. A. Harmon and Robberson Steel Company to enter into a settlement with the plaintiffs in the said lawsuits pending in the Circuit Court of Washington County, Arkansas, without prejudice to any rights that D. A. Harmon might have arising out of the subcontract between D. A. Harmon and Robberson Steel Company.

"In consideration of the contribution by D. A. Harmon and Robberson Steel Company toward the settlement of the said lawsuits, and in consideration of the mutual covenants herein contained, it is understood and agreed as follows:

"D. A. Harmon specifically reserves all rights, if any, that he might have against Robberson Steel Company by reason of the said subcontract entered into between the parties.

"D. A. Harmon specifically waives and releases any claim against Robberson Steel Company as a result of the contribution by D. A. Harmon to the settlement with the plaintiffs in the said lawsuits in Washington County, Arkansas, other than the claim of contractual indemnity arising out of the said subcontract. This waiver and release includes any claim for contribution or liability for indemnity imposed by law and any other claim which does not involve directly a claim for contractual indemnity arising out of the said subcontract.

"Robberson Steel Company specifically waives and releases any claim against D. A. Harmon based upon the contribution by Robberson Steel Company to the settlement with the plaintiffs in the said lawsuits.

"The amount of the settlement is fair and reasonable, and Robberson Steel Company specifically waives the right to question at any time the fairness and reasonableness of the amount paid.

"D. A. Harmon and Robberson Steel Company specifically deny liability to the plaintiffs in the said lawsuits, and each of the parties to this agreement denies that he, or his agents, servants, or employees, was negligent; and the fact of the said settlement shall never be construed or used in any way as an admission of liability or negligence on the part of D. A. Harmon or Robberson Steel Company.

"In connection with the said settlement, a judgment will be entered against D. A. Harmon and Robberson Steel Company. The said judgment, or judgments, will constitute a part of the settlement procedure, and, as between D. A. Harmon and Robberson Steel Company, they shall not be construed as 'an adjudication of liability or negligence on the part of either D. A. Harmon or Robberson Steel Company; and both D. A. Harmon and Robberson Steel Company agree that neither of them will plead such judgment, or judgments, as an adjudication of liability or negligence, or attempt to rely upon such judgment, or judg-

ments, in any way, as an adjudication or admission of liability or negligence.

"With the single exception that the parties have agreed that the amount of the settlement is fair and reasonable, it is the purpose of this agreement to permit D. A. Harmon and Robberson Steel Company to effect a settlement with the plaintiffs in the lawsuits now pending in the Circuit Court of Washington County, Arkansas, without prejudice to the claim of D. A. Harmon for contractual indemnity under the subcontract between the parties and without prejudice to the defenses of Robberson Steel Company to such claim for contractual indemnity. D. A. Harmon's claim of contractual indemnity and Robberson Steel Company's defenses thereto are specifically reserved, with the single exception that Robberson Steel Company expressly waives any defense based upon a contention that the amount paid in settlement was not reasonable.

"It is the further purpose of this agreement that D. A. Harmon release Robberson Steel Company and Robberson Steel Company release D. A. Harmon from any claims arising out of the respective contributions to the settlement with the plaintiffs in the said lawsuits in Washington County, Arkansas, except the claim of D. A. Harmon against Robberson Steel Company for contractual indemnity under the said subcontract."

5

Prior to the erection of the structural steel the employees of plaintiff Harmon had constructed concrete foundations for the support of the base of each frame, upon which the vertical columns of the structural steel were to be set. Anchor bolts were to be placed in the concrete foundations and were to extend above the top of each concrete foundation a sufficient distance to permit the rigid steel frames to be securely anchored to the foundation. The anchor bolts in the northwest concrete foundation did not extend a sufficient distance above the concrete top to permit the vertical steel column to be bolted down, and it was necessary to either remove the northwest concrete foundation entirely or to weld extensions on the anchor bolts. The latter course was followed, and an uncertified welder was obtained to weld extensions on the anchor bolts of sufficient length to permit the anchoring of the rigid steel frame to the concrete foundation. The welder was called by one of the employees of the plaintiff Harmon, and said employee did not ascertain whether the welder was a certified welder. (The foreman of the plaintiff Harmon had insisted in his discussions with the foreman of Bailey Steel Construction Company that all welding done by Bailey should be done by a certified welder.)

The welder did not do the work in a proper manner, and the anchor bolts, as welded, were of much less strength than they should have been.

The anchor bolts in the southwest, northeast and southeast concrete foundations extended far enough above the top of the concrete foundation to permit the anchoring of the rigid steel frames without any extension of the bolts.

6

At the time of the collapse of the structural steel the employees of Bailey Steel Construction Company had in place the north rigid frame and the next rigid frame to the south of the north rigid frame. Each rigid frame was in the form of an arch in an east-west direction and consisted of a vertical column 25 feet and 8⁹⁄₁₆ inches long, fastened by nuts on the anchor bolts set in the concrete foundation; attached to the top of the vertical steel column was a haunch, a member in the form of an elbow, which was attached to the vertical member and extended vertically above the top end of the vertical column a distance of 14 feet and 3⁷⁄₁₆ inches, to the beginning of the arch, which extended upward towards the center of the building 26 feet and 3¼ inches; attached to the

haunch was an I-beam 40 feet and 3 inches long, and attached to the I-beam was the apex 17 feet long from the end of the I-beam to the top and, of course, extending another 17 feet downward to connect with the corresponding I-beam on the other side, which I-beam in turn connected with the haunch and the haunch to the vertical column attached to the concrete foundation. Thus the rigid arch from the top of the vertical columns on either side was 195 feet and 7⅜ inches in length. The distance east and west between the vertical columns was 160 feet and the bases of the columns were tied together by a heavy steel rod extending from and to the east-west opposite columns.

As above stated the workmen had in place two of the rigid arches. The distance north and south between the arches was 55 feet, and the rigid arches were connected at the eaves on either side by a steel eave truss attached to the haunch at the beginning of the arch. Also, there were steel purlins connected near the inside ends of the haunches. Another purlin connected the I-beams on either frame. In all there were two eave trusses and only four purlins connecting the rigid frames. A cable was attached to the apex in the south rigid frame extending diagonally southward to the ground, and three cables were attached to the north apex extending diagonally northward to the ground, and extending from the north rigid frame on each end were two cables, one connected to the haunch and one connected to the I-beam, and extending diagonally southwesterly and southeasterly to the bases of the vertical columns supporting the south rigid frame. An A-frame was set under and near the inside end of the haunches attached to the southwest and southeast vertical columns.

The apex was 64 feet high, and the workmen were attempting to put in place the ridge beam between the north and south apexes. The ridge beam was held in place by a cable attached to a crane. The north end of the ridge beam was in the groove in the north apex, and the workmen were attempting to place the south end of the ridge beam in the apex of the south arch by hammering and pulling on the south end of the ridge beam. A flange extended several inches on either side of the apex member, and the workmen were attempting to force the ridge beam over the flange and into the center of the apex. Finally, after much heavy hammering and pulling with a machine to such an extent that the beam was warped, the beam slipped under the flange on the top and lower edges of the apex. The impact of the ridge beam striking the apex member when it was forced over the flanges was so terrific that it created a severe vibration extending to all members of both the north and south rigid frames.

The component members of the structure had not been welded but were connected by alignment plates held in place by ¾-inch bolts extending through the alignment plates and the ends of the connecting members.

When the ridge beam was forced into place and the vibration of both rigid frames began, there was an immediate and simultaneous collapse of all the steel with the exception of the vertical columns on the northeast and southeast corners and the column and haunch on the southwest corner.

The plaintiffs introduced Exhibit 5-A, which was a model of the structure prior to collapse. Exhibit 5-B showed the position of each steel member after the collapse. The models were made to scale, and it was agreed by all parties that they accurately reflected the structure immediately before and after it collapsed.

The weight of each of the four haunches was 14,600 lbs. The weight of each of the four I-beams was 9,000 lbs. The weight of each apex was 8,800 lbs. The ridge beam weighed 6,537 lbs. The weight of each of the four purlins was 6,000 lbs. Each eave truss weighed 4,000 lbs. Thus the total weight of both rigid frames was 150,537 lbs. exclusive of the vertical steel columns attached to the concrete foundation.

Several of the witnesses testified with respect to the fall of the structure. John Red Davis, an employee of the University of Arkansas athletic department, testified that he was in the football stadium about 150 yards northwest of the structure and saw it fall. He was of the opinion that the structure started falling at the northwest corner. One of the workmen, Garner Garrison, was also of the opinion that the fall began at the northwest corner. On the other hand, Warren Carpenter, a member of the University of Arkansas track team, was also in the football stadium and saw the fall of the structure. He was of the opinion that the south apex was the first member of the structure to fall. Laymon Garrison, another workman, was on top of the south apex, and it seemed to him that the north frame began to fall first. Another workman, L. E. Heindselman, testified that the whole structure quivered and then collapsed, and that the various members of the structure seemed to drop straight down. All the witnesses seemed to agree that the collapse of the members of the structure was practically simultaneous and that the collapse occurred immediately after the hammering on the ridge beam ceased.

It seems clear that the witnesses who saw the collapse of the structure were looking at various parts of the structure at the time of the collapse, and each witness was of the opinion that the part of the structure at which he was looking was the first part of the structure that began to fall.

The evidence as a whole convinces the Court that the collapse of the structure occurred all at one time and immediately after the ridge beam was forced into position. In all likelihood there was already some vibration in the structure as a result of the hammering on the ridge beam, and when the ridge beam was forced into position an additional and much greater vibration occurred causing the collapse of the entire structure.

The only vertical column that fell was the northwest column which had been bolted down by defectively welded anchor bolts, but the Court does not believe that the collapse of the structure was proximately caused or contributed to by the defective condition of the anchor bolts in the northwest concrete foundation upon which the northwest vertical column stood.

Many photographs were introduced showing the condition of the concrete foundations, the anchor bolts, and other parts of the structure after the collapse. Defendant's expert witnesses were of the opinion that the northwest column swayed westward prior to the collapse of the structure, but the anchor bolts to which the northwest vertical steel column was attached were bent to the east, and a consideration of the photographs and the bent and broken anchor bolts in the northwest concrete foundation along with the other evidence convinces the Court that the collapse of the structure did not start at the northwest corner, and was not caused or contributed to by the defective anchor bolts.

The ¾-inch bolts that connected the various pieces of the steel were practically all sheared or severed, and an examination of plaintiffs' Exhibit 5-D, which shows the exact position of each steel member after the collapse convinces the Court that the proximate cause of the collapse was the vibration that was produced when the ridge beam was finally forced between the flanges of the south apex member. Evidently another contributing cause of the collapse was the failure of the workmen to have A-frames or other braces under the rigid arch members.

9

The plaintiffs introduced three engineers, Paul Martin Zander, Neil B. Garver, and Ben W. Hopkins. The defendant introduced five engineers, James B. Davis, Guy M. Keith, E. C. Parker, Guy B. Treat, and George Singleton.

All the engineers were at the scene of the collapse after the steel had fallen and

before any of it had been moved. All agreed that the position of each member was correctly reflected by plaintiffs' Exhibit 5-B. The defendant's witnesses were of the opinion that the breaking of the anchor bolts at the northwest column was the immediate cause of collapse.

On the other hand, the engineer witnesses for plaintiffs were of the opinion that the sudden clearing of the flanges on the south apex member by the ridge beam, which was being hammered by hand and pulled by a machine into place, started a vibration which was the primary and proximate cause of the collapse. Their opinion was partially concurred in by the defendant's witness, Mr. Singleton.

All of the engineer witnesses testified that vibration applied at any point in a steel structure would immediately be felt throughout the structural steel, and its normal path would seek the point of least resistance. The engineer witnesses for defendant were of the opinion that the point of least resistance to the vibration was the defective anchor bolts in the northwest foundation, while the engineer witnesses for plaintiffs were of the opinion that the point of least resistance to the vibration was the joints of the various members which, as heretofore stated, were joined only by alignment plates and ¾-inch bolts. They reasoned that because of the weight of the rigid frames and the length thereof, and the failure to weld the connections between the various members, the bolts through the alignment plates and connecting members were not of sufficient strength to withstand the vibration and swaying of the frames. They are corroborated in that opinion to a large extent by the position of the individual members after the collapse.

### 10

A consideration of the testimony of all the witnesses and the exhibits convinces the Court that the primary and proximate cause of the collapse was the driving and forcing of the ridge beam over the flanges of the south apex member, which created a vibration of such force as to snap and break the ¾-inch bolts in the members and alignment plates. Also the failure to have supporting A-frames or shoring of the unwelded members of the rigid frames contributed thereto. In other words, the Court finds that the weakness of the welded anchor bolts holding the northwest vertical steel column was not a proximate nor a contributing cause of the collapse.

### 11

Jesse L. Bailey, doing business as Bailey Steel Construction Company, in the erection of the steel was acting as agent of the defendant, Robberson Steel Company.

### 12

In the damage suits filed by the personal representative of the deceased workman and the individual injured workmen, they alleged primary negligence on the part of both plaintiff Harmon and the defendant. The defendant refused upon demand by plaintiff Harmon to indemnify Harmon against loss, cost or expense in connection with the suits.

### 13

The plaintiff, American Motorists Insurance Company, paid $50,000 in the settlement of the damage suits, and in addition thereto incurred and paid expenses in the sum of $10,000 in connection with the defense of said suits.

The plaintiff, D. A. Harmon, testified that the premium on the liability policy carried by him with the plaintiff, American Motorists Insurance Company, was on a retrospective basis, and the amount of the premium was determined by a consideration of the nature of the work, and the amount of the losses incurred, including litigation expenses, and further stated that because of the basis on which the premium was determined he was required to pay the greater portion of any loss.

The policy itself was not introduced, and there was no other testimony as to the amount of the premium or the relationship between the two plaintiffs in reference to the liability insurance.

The Liberty Mutual Insurance Company was the liability insurance carrier of the defendant, Robberson Steel Company, and paid $50,000 in the settlement of the damage suits.

### 14

The defendant sustained a loss of $47,-273.50 in repairing the damaged steel and in replacing it in position.

### 15

The plaintiff Harmon sustained a loss of $8,527.66 to the partially completed installations in the field house because of the collapse of the structural steel.

### Discussion

As stated in Finding of Fact No. 2, the sub-contract between Harmon and Robberson, among other things, provided:

"* * * Sub-Contractor (defendant) * * *, notwithstanding any insurance that may be provided for or carried, agrees to be responsible for and indemnifies and agrees to hold Contractor harmless from any loss, injury or damage, either to persons or property, arising out of or resulting from the performance by Sub-Contractor of the work covered by this sub-contract or occasioned by the act or neglect of Sub-Contractor or his agents, Servants or employees."

In Harmon's motion for summary judgment filed July 11, 1957, he contended that under the terms of the sub-contract Robberson was required to indemnify him for the loss involved, even if the loss were caused in whole or in part by the negligence of Harmon. The Court was (and still is) of the opinion that the provisions of the sub-contract were not sufficient to indemnify Harmon for the consequence of his own negligence, if any, and the Court overruled Harmon's motion for summary judgment. See generally, Annotation, 175 A.L.R. 8 et seq.

Plaintiffs do not concede the correctness of the Court's ruling on the motion for summary judgment, but in the event the Court's ruling on the motion was correct, plaintiffs contend that Harmon was not guilty of any negligence which proximately contributed to or caused the collapse of the structure and the ensuing damages, and that under the terms of the sub-contract Harmon and American Motorists Insurance Company (by its right of subrogation) are entitled to be indemnified by the defendant.

Defendant, on the other hand, makes the following principal contentions in its brief: (1) Harmon was guilty of negligence in installing defective anchor bolts and, therefore, cannot recover against the defendant; (2) in any event, Harmon was at least equally responsible for the collapse of the structure and that the loss should be apportioned according to the degree of negligence of Harmon and Robberson; and (3) plaintiffs cannot recover the $10,000 expended in defending the State court actions since the actions were the result of Harmon's own negligence.

It is readily apparent that the three contentions of defendant are based upon the premise that Harmon was guilty of at least some negligence which was a proximate cause of the collapse and ensuing damages. Since the Court has found as a fact (Finding of Fact No. 10) that the weakness of the welded anchor bolts was not a proximate or contributing cause of the collapse, it follows that Harmon was not guilty of any actionable negligence and defendant's contentions must fail along with the premise upon which they were founded.

In other words, the Court is convinced that the sole proximate cause of the collapse of the structure and the ensuing damages was the negligence of the employees of Jesse L. Bailey, d/b/a Bailey Steel Construction Company, in forcing the ridge beam into the south apex member, and in erecting the structure without the use of sufficient A-frames or shoring (see Finding of Fact No. 10). And even if Harmon were found guilty of negligence in reference to the defectively welded anchor bolts, such negligence would not be actionable since it was not

a proximate cause of the fall of the structure.

At the trial the defendant made the additional contention that the actions brought by the injured employees of Bailey in the State court were only against Harmon and Robberson, and that Bailey was not and could not be made a party defendant because the workmen were receiving workmen's compensation benefits through Bailey's compensation carrier. Apparently it was defendant's contention that plaintiffs herein could not recover indemnity from defendant for any loss caused by negligence of Bailey. This contention has not been pressed in defendant's brief on the merits, and perhaps it has been abandoned.

In any event, the contention is without merit since the sub-contract specifically provides that Robberson shall indemnify Harmon from any loss, injury or damage arising out of or resulting from Robberson's performance of the work, or occasioned by the act or neglect of Robberson Steel Company, its agents, servants or employees. Unquestionably the injuries and damages in the instant case arose out of the work of Robberson and its agent, Jesse L. Bailey, d/b/a Bailey Steel Construction Company, and Robberson must indemnify Harmon for his loss. Of course, American Motorists Insurance Company, by reason of its subrogation rights, is also entitled to indemnity from Robberson. For a case very similar to the instant one, see C & L Rural Electric Co-op. Corp. v. Kincaid, 221 Ark. 450, 256 S.W.2d 337; Kincade v. C & L Rural Electric Co-op. Corp., Ark. 299 S.W.2d 67.

### Conclusions of Law

1

The Court has jurisdiction of the parties and the subject matter herein.

2

The plaintiff, D. A. Harmon, was not guilty of any negligence which was a proximate cause of the collapse of the structure and the ensuing damages.

3

The counterclaim of the defendant, Robberson Steel Company, a corporation, should be dismissed.

4

Jesse L. Bailey, d/b/a Bailey Steel Construction Company, was guilty of negligence which was the sole proximate cause of the collapse of the structure and the ensuing damages.

5

Jesse L. Bailey, d/b/a Bailey Steel Construction Company was an agent of the defendant, Robberson Steel Company.

6

As a result of the collapse of the structure the plaintiff, D. A. Harmon, has sustained damages in the sum of $8,527.66 for work necessary to replace installations damaged by the collapse. The plaintiffs, D. A. Harmon and American Motorists Insurance Company, have sustained damages in the sum of $60,000, $50,000 being paid in settlement of the suits by the injured workmen in the State Court, and $10,000 being the expense incurred in the defense of said suits.

7

Under the "Sub-Contract Agreement" between D. A. Harmon and Robberson Steel Company, D. A. Harmon and American Motorists Insurance Company (by reason of its subrogation rights) are entitled to indemnity from Robberson Steel Company for their damages.

8

The plaintiff, D. A. Harmon, is entitled to a judgment against the defendant, Robberson Steel Company, a corporation, in the sum of $8,527.66. The plaintiffs, D. A. Harmon and American Motorists Insurance Company, are entitled to a joint judgment against defendant, Robberson Steel Company, a corporation, in the sum of $60,000 and court costs.

A judgment in accordance with the above should be entered.